**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DAVID FELIMON CERDA,                )
                                    )
                Plaintiff,          )        Case No. 17 C 9023
                                    )
        v.                          )
                                    )        Judge Jorge L. Alonso
CHICAGO CUBS                        )
BASEBALL CLUB, LLC,                 )
                                    )
                Defendant.          )

**MEMORANDUM OPINION AND ORDER**

Plaintiff, a Chicago-resident and long-time fan of the Chicago Cubs baseball team, has

been attending games at the historic Wrigley Field for over a decade. Wrigley Field, which

opened in 1914, has been home to the Chicago Cubs since 1916 and is the second oldest ballpark

in the major leagues. Designed in part by early 20th century ballpark architect Zachary Taylor

Davis, Wrigley Field is designated as both a Chicago Landmark and a National Historic

Landmark. This lawsuit stems from a renovation project (the "1060 Project") commenced

following the 2014 baseball season by Defendant Chicago Cubs Baseball Club, LLC

("Defendant" or "the Cubs") to structurally reinforce, repair, and modernize the facility, while

preserving its historic features and improving accessibility for people with disabilities.

Plaintiff attended many games at Wrigley Field with his godfather, Professor Joseph

Ferrie, both before and after the 1060 Project. Prior to 2014, Plaintiff, who has Duchenne

Muscular Dystrophy and uses a power chair for mobility, particularly enjoyed sitting in

accessible seating formerly located behind home plate and in the area currently known as

"Budweiser Patio" in the right field bleachers. As a result of the 1060 Project, however, the

accessible seating area behind home plate no longer exists as it once did. As for the Budweiser Patio, seating in that area has been sold exclusively to groups since at least 2012, meaning an individual patron (regardless of their need for accessible or standard seating) can no longer buy an individual ticket.

In December 2017, as the multi-phase 1060 Project remained ongoing, Plaintiff filed this discrimination action against the Cubs pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. In its enactment of the ADA, Congress expressly found that physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination. 42 U.S.C. § 12101(a)(1). Individuals with disabilities have been, historically, isolated and segregated by society, which continues to be a serious and pervasive social problem. 42 U.S.C. § 12101(a)(2). Discrimination against individuals with disabilities persists in such critical areas as public accommodations, 42 U.S.C. § 12101(a)(3), including the discriminatory effects of architectural barriers, failure to make modifications to existing facilities, and segregation. 42 U.S.C. § 12101(a)(5). In this case, Plaintiff alleges that the Cubs discriminated against him in violation of the ADA by failing to have the minimum number of accessible seats at Wrigley Field and by failing to horizontally disperse accessible seating around the stadium.

The Court held a five-day bench trial beginning April 10, 2023, during which fact witnesses for both sides, and one expert witness for the Cubs, testified. Having considered the trial evidence, the parties' stipulated facts and their post-trial submissions (*see* Defendant's Proposed Findings of Fact and Conclusions of Law ("DPFFCL"), ECF No. 245; Plaintiff's [proposed] (Corrected) Findings of Facts and Conclusions of Law ("PPFFCL"), ECF No. 247),

the Court enters the following findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").

These findings are informed by the Court's credibility assessment of witnesses and the Court's weighing of the evidence. *See Lucien v. Welborn*, 46 F.3d 1133 (7th Cir. 1995); *United States v. Miller*, 800 F.2d 129, 136 (7th Cir. 1986). "In a bench trial or hearing without a jury, the district court acts as both gatekeeper and factfinder." *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013). To the extent that any findings of fact may be considered conclusions of law, they shall be deemed conclusions of law. The same is true with respect to conclusions of law which may be deemed findings of fact. *See id*.; *see also In re. Lemmons & Company, Inc.*, 742 F.3d 1064, 1070 (7th Cir. 1984) ("The labels of fact and law assigned by the trial court are not controlling.").

For the reasons set forth below, the Court finds that Plaintiff has not met his burden of proof on liability and enters judgment in favor of the Cubs.

## FINDINGS OF FACT

### I.    Background

#### A.  The Parties

Plaintiff, a resident of Chicago, Illinois, is a longtime fan of the Chicago Cubs. (Joint Stmt. of Uncontested Facts ("Joint Stmt.") ¶ 1, ECF No. 220; Tr. 703:4-12.)[1] He has Duchenne Muscular Dystrophy, can no longer walk, and uses a power wheelchair for mobility. (Joint Stmt. ¶ 6.) He has used a wheelchair since 2006. (*Id.*)

---

[1] The Court refers to the trial transcripts for the entire trial collectively as "Tr."

Defendant is a professional baseball team that plays home games at Wrigley Field, a major league ballpark in Chicago. (*Id*. ¶ 7.)

### B. Wrigley Field

Wrigley Field has been home to the Chicago Cubs since 1916. (Joint Stmt. ¶ 8; Tr. 594:13-14.) First opened in 1914, it is the second oldest ballpark in the major leagues. (Tr. 594:17-22.) The lower decks of Wrigley Field's grandstand represent the last surviving design of Zachary Taylor Davis, one of the nation's best-known ballpark architects in the early 20th century. (Tr. 594:23-595:2; DX 159.)

The Chicago City Council designated Wrigley Field as a Chicago Landmark in 2004, and in 2020, the National Park Service designated the ballpark as a National Historic Landmark. (Tr. 595:3-7; DX 159.) The ordinance designating Wrigley Field a Chicago Landmark protects, among other things, the "unenclosed, open air character, the exposed structural system, and the generally uninterrupted 'sweep' and contour of the grandstand and bleachers." (DX 159.) Wrigley Field also has a historic, hand-operated scoreboard above the center field bleachers. (Tr. 330:8-10.)

Wrigley Field's structural system, common to ballparks of its age, is different from what is seen in new ballparks being built today. (Tr. 259:10-14.) That structural system includes columns that run from below the main concourse level at ground level that proceed up through the lower grandstand, through and supporting the upper deck, until they reach the roof line. (Tr. 259:15-20, 312:13-18.) Wrigley Field's unique layout and structural system, true to its age, allows for the ballpark to have closer, lower seating than other ballparks that are being built today, giving Wrigley Field its signature "close[] . . . coz[y] feeling[,]" commonly referred to as "the friendly confines." (Tr. 260:5-12 (Meenan).)

### C.  Plaintiff's Attendance at Wrigley Field Prior to 2014

Plaintiff attended numerous games at Wrigley Field prior to 2014. (Joint Stmt. ¶ 9.)
Plaintiff sat in accessible seating located in the area currently known as Budweiser Patio in the
right field bleachers, behind home plate, in the last row of the terrace level seats on the third base
line, and the upper deck beneath the press box. (*Id.*) Plaintiff particularly enjoyed sitting behind
home plate because "you could really see the action" and he did not feel isolated from patrons
with general admission tickets, as well as in the right field bleachers (now-Budweiser Patio)
because players would throw baseballs up into that section, home runs came in that direction,
and "[s]ometimes when the action was getting good, you could hear the players talking to the
fans." (Tr. 710:9-711:7, 711:24-712:12 (Cerda).) Plaintiff found it very exciting when there was
a home run and general admission patrons sitting around him would "turn around and say
something, or give [him] a high five or something like that, or a smile." (Tr. 754:3-11 (Cerda).)

### D.  The 1060 Project

At the conclusion of the 2014 season, the Cubs broke ground on the 1060 Project—a
multi-phase, multi-year renovation to upgrade the ballpark and ensure its viability for years to
come. (Joint Stmt. ¶ 10; Tr. 612:13-613:9, 615:14-18.) The renovation involved structurally
reinforcing and repairing the facility and modernizing it to remain competitive with other major
league venues, while preserving its historic features and improving accessibility for people with
disabilities. (Tr. 609:23-611:19.)

Renovation work was phased to occur primarily during the relatively short off-season
period each year to allow the Cubs to continue to play at the ballpark during baseball season. (Tr.
612:21-613:9.) To accommodate structural and other work that had to be completed first, the

addition and modification of accessible seats in the grandstand occurred during the latter phases of the renovation. (Tr. 613:24-615:5, 619:12-16, 625:14-626:9.)

The permitting process for the 1060 Project required review and approval, including by the Commission on Chicago Landmarks ("CCL") to ensure modifications complied with Wrigley Field's Chicago landmark and federal landmark designations. (Tr. 600:2-9, 602:6-9; DX 160; DX 161; *see also* DX 159.) The City of Chicago specifically dictated that "[t]he grandstand repair work will match the existing shape, rise and run of the existing grandstand structure." (DX 160; Tr. 601:2-7.) Carl Rice, who led the 1060 Project on behalf of the Cubs, explained at trial that because of strict restrictions due to the field's landmark status, "the rise and treads and risers and the height of the ballpark, the elevations, the ramps, they were all rebuilt to replicate what was already there . . . the ballpark was built like in kind." (Tr. 582:23-583:4; *see also* Tr. 695:4-13.) Patrick Meenan, Cubs' Vice President of Operations, further testified regarding the restrictions imposed by the external footprint of the field within the confines of the surrounding Chicago neighborhood. (*See, e.g.*, Tr. 276:2-15.)

### i.    Phase 1 (2014-2015 Off-season)

Phase 1 of the 1060 Project included work on the left field corner, including new concession stands and restrooms, structural steel, and the façade. (Tr. 615:19-23.) The Cubs also reconstructed the bleachers from the ground up, including new elevators, concession stands, and accessible seating in the left and right field porches. (Tr. 584:22-23, 614:23-615:2, 615:23-616:2, 616:13-21.) Prior to the 1060 Project there were no left or right field porches. (Tr. 365:7-14.) The seating structure of the center field bleachers was not demolished or reconstructed in any phase of the renovation. (Tr. 359:1-13.) At some point during the 1060 Project, two large electronic

videoboards (also known as "Jumbotrons") were installed above the left and right field bleachers, respectively. (Joint Stmt. ¶ 19; Tr. 584:24-585:1, 683:7-12.)

### ii.    Phase 2 (2015-2016 Off-season)

Phase 2 concentrated on the home plate area, including the structural steel, concrete, concessions, restrooms, and façade. (Tr. 617:10-18.) The Cubs also made the concession stands and restrooms more accessible. (Tr. 617:22-24.)

### iii.    Phase 3 (2016-2017 Off-season)

Phase 3 was delayed due to the Cubs' World Series victory in November 2016. (Tr. 618:3-10.) Renovations included steel work on the right field side of the ballpark, replacing concrete and the structure underneath the seating behind home plate, installing club seating, and continuing installation of new restrooms and concessions. (Tr. 618:19-619:11.) The accessible seats at the 100 level were added behind home plate, as well as lifts to make those sections accessible.  ( Tr. 619:12-16.)

### iv.    Phase 4 (2017-2018 Off-season)

Phase 4 included finalizing structural modifications required to later add new club seating areas, completing approximately half of the work required at the suite level, installing larger dugouts, replacing seats in the lower bowl of the grandstand that had surpassed their useful life, and completing work on concessions and restrooms. (Tr. 621:13- 622:3.) The Cubs also continued to improve the accessibility of elevators, concession stands, and restrooms, and completed some work on relocating accessible seating on the terrace level. (Tr. 622:4-13.)

### v.    Phase 5 (2018-2019 Off-season)

Phase 5—the final phase of the renovation—involved completing club seating and the suite level, improving the visiting team's facilities, replacing worn-out seats, and installing

signage. (Tr. 625:14-626:9.) Prior to the renovation, the upper deck had only one concession

stand underneath the press box and very few bathrooms. (Tr. 623:6-8.) The Cubs built a new

concourse to the exterior upper deck that includes bathrooms, concessions, and room to traverse

the upper deck outside the seating bowl. (Tr. 622:16-623:14.) As a result, patrons in wheelchairs

are able to reach the upper patios without the assistance of any staff, and congestion on the upper

deck cross-aisle has been alleviated. (Tr. 623:15-25, 624:5-19.) The Cubs also installed an

elevator in the right field corner to provide access to the upper deck. (Tr. 625:24-626:2.) Over

the course of the 1060 Project, the number of elevators increased from five to 16. (Tr. 276:22-23;

DX 170.)

The majority of accessible seats available at Wrigley Field today were installed during

Phase 5, including those on the first and third base sides of the 100 level, first and third base

sides and behind home plate on the 200 level, and Sections 303L, 309L, 319R, 328R, and 331R

in the upper deck. (Tr. 284:25-285:4; DX 9; DX 225.) In determining the positioning of

accessible seats during the 1060 Project, the Cubs attempted, among other things, to minimize

the distance between the accessible seats and the vertical accessible routes, restrooms, and

concessions. (Tr. 552:3-4, 644:23-645:11.)

Prior to the start of the 2019 season, the Cubs implemented a new numbering system for

seats at Wrigley Field, converting from an aisle-based system to a section-based system. (Joint

Stmt. ¶ 12; Tr. 604:1-7.)

### vi. Additional Remaining Renovations and the DOJ Lawsuit

Following Phase 5, certain planned modifications remained to be completed as a result of

construction issues, including with respect to some of the accessible seats on the 300 level. (Tr.

626:10-627:4.) Although the Cubs intended to complete the remaining accessible seats prior to

the 2020 season, they postponed that work when the U.S. Department of Justice ("DOJ") initiated a compliance review of Wrigley Field in November 2019. (Tr. 627:3-4, 627:10-13.) The coronavirus public health pandemic began shortly thereafter and patrons were not permitted to attend games at Wrigley Field during the 2020 season. (Joint Stmt. ¶ 13.)

In July 2022, the DOJ filed a lawsuit regarding Wrigley Field's compliance with Title III of the ADA. *See U.S. v. Chi. Baseball Holdings LLC, et al.*, Case No. 1:22-cv-03639 (N.D. Ill. 2022). After the DOJ compliance review and the Cubs' 2022 season concluded, the Cubs installed the remaining 21 planned accessible seats on the 300 level during the 2022-2023 off-season, which were not completed until March 2023. (Tr. 285:5-14.)

## II. Accessible Seating at Wrigley Field Today

Wrigley Field currently has 39,510 total seats, excluding those areas which are not ticketed and sold as individual seats. (DX 11; Tr. 495:18-25, 27:6-9.) Of those seats, 225 are designated as accessible. (DX 11; DX 229; Tr. 276:16-22, 286:5-18.) The parties agree that the 2010 Standards require a minimum of 209 accessible seats at Wrigley Field. 2010 Standards § 221.2.1.1; (DX 11; DX 229; Tr. 27:6-9, 496:23-497:3.) Each accessible seat includes two seat numbers, one for a wheelchair space and one for an adjacent companion seat. (DX 11; *see* Tr. 393:3-6.) [2]

### A. Availability

The Cubs' Senior Director of Ticket Operations, Anuj Patel, testified at trial that the Cubs have not sold out accessible seats or "turn[ed] away a fan who needed an accessible seat" since

---

[2] The Court utilizes the parties' meaning of the term "seat" throughout this Opinion, which when used in reference to accessible seating at Wrigley Field refers not to a physical chair, but a designated space that can be occupied by both an individual in a wheelchair and their companion in a folding chair. *But see* 2010 Standards § 106.5 (defining "wheelchair space" as "[s]pace for a single wheelchair and its occupant.").

he joined the Cubs in 2016. (Tr. 808:16-18, 809:19-25.) In fact, there are more accessible seats available than the demand. (Tr. 809:5-13.) As a result, Cubs' staff are able to assist those patrons with standard seating tickets who, once they get to the stadium, end up requiring accessible seats. (Tr. 807:19-808:8.) Similarly, if a patron's individual wheelchair or mobility device does not fit in a particular accessible seat, the Cubs can assist with finding other accessible seating options. (Tr. 808:9-15, Tr. 462:17-463:3.)

### B. Locations

Accessible seating at Wrigley Field provides a variety of perspectives of the field, including from the left, center, and right field bleachers, as well as from behind home and on the first and third-base sides of the grandstand. (DX 52-92 (Cubs 3D Seat Viewer images of a view of the playing field from each accessible seating section at Wrigley Field); *see also, e.g.*, PX 76, PX 89, PX 104, PX 116, PX 118, PX 125, PX 127, PX 130, PX 145, PX 147, PX 149, PX 170, PX 189 (photographs taken by Plaintiff's photographer, Thomas C. Eley, III, of a view of the playing field from certain accessible seating sections at Wrigley Field).)

The Court, upon motion by the Plaintiff and unopposed by the Cubs, conducted a site visit during trial to view the accessible seating locations, and the views therefrom, at Wrigley Field. (*See* Order Regarding The Court's Visit to Wrigley Field, ECF No. 242.) In addition to the testimony and photographs admitted at trial, the site visit impressed upon the Court the variety of locations and views on offer for patrons who require accessible seating, as well as that "friendly confines" feeling that is unique to Wrigley Field.

What follows is a chart of the seats designated by the Cubs as accessible at Wrigley Field:

| Section | Row | Number of Seats |
|---------|-----|-----------------|

| | | Designated as Accessible |
|---|---|---|
| 101 | 13 | 4 |
| 102 | 13 | 5 |
| 103 | 13 | 5 |
| 104 | 13 | 5 |
| 105 | 13 | 5 |
| 117 | 13 | 5 |
| 118 | 13 | 4 |
| 119 | 13 | 6 |
| 120 | 13 | 4 |
| 130 | 13 | 5 |
| 131 | 13 | 5 |
| 132 | 13 | 5 |
| 133 | 13 | 5 |
| 134 | 13 | 3 |
| 203 | 29 | 4 |
| 206 | 21 | 7 |
| 207 | 21 | 7 |
| 214 | 21 | 7 |
| 215 | 21 | 7 |
| 216 | 21 | 2 |
| 217 | 21 | 10 |
| 218 | 21 | 9 |
| 227 | 21 | 7 |
| 228 | 21 | 7 |
| 229 | 21 | 4 |
| 230 | 29 | 3 |
| 231 | 29 | 2 |
| 303L | 9 | 4 |
| 304L | 9 | 6 |
| 306L | 10 | 4 |
| 309L | 9 | 6 |
| 313L | 10 | 3 |
| 315L | 9 | 3 |
| 319R | 9 | 2 |
| 323R | 10 | 4 |
| 328R | 10 | 6 |
| 330R | 10 | 4 |
| 331R | 9 | 4 |
| 501 | Bleachers General Admission | 3 |
| Left Field Porch | Bleachers General | 7 |

| | Admission | |
|---|---|---|
| Center field Bleachers ("Batter's Eye") | Bleachers General Admission | 15 |
| Right Field Porch | Bleachers General Admission | 12 |
| | | **Total: 225** |

(DX 11; DX 225; DX 229; DPFFCL ¶ 37.)

### C. 200 Level (Terrace Level)

The seating sections in the lower part of the grandstand numbered in the 200s are known as the "Terrace Level" or 200 level of Wrigley Field. (Joint Stmt. ¶ 15.) 36% of overall seating at Wrigley Field is located on the Terrace Level. (DX 231.) Accessible seats located on the Terrace Level represent 34% of the total 225 accessible seats. (DX 231; Tr. 540:13-541:5.)

The greater part of the Terrace Level is positioned under the upper deck, which extends nearly the full length of the airspace above the Terrace Level. (Tr. 296:11-25.) For the most part, the columns supporting the upper deck fall in approximately the fifth or sixth row of the Terrace Level, meaning generally 15 to 16 rows of seating fall behind the columns. (Tr. 312:19-313:1.) There are between 10,000 and 11,000 standard seats under the overhang of the upper deck and over 9,500 standard seats behind the support columns that support the upper deck. (Tr. 312:1-20.) Because of the support columns and the overhang of the upper deck, the historic center field scoreboard, the Jumbotrons, and/or the full trajectory of a pop up or fly ball can be difficult to see from accessible seating in Sections 206, 214, 215, 216, 217, 227, 230 and 231. (PPFFCL ¶¶ 51-78.) This makes up 45 of the total 225 accessible seats.

Defendant submitted testimonial and photographic evidence that the historic scoreboard, the Jumbotrons, and/or the full trajectory of a pop up or fly ball can also be difficult to see from

standard seating at least one to two rows in front of the accessible seating. (Tr. 313:2-316:10, 543:20-23, 662:12-14; DX 235 (comparing views of the playing field from Accessible and standard seats in Section 227).) The Cubs introduced expert testimony from Doug Anderson, who served on the United States Architectural and Transportation Barriers Compliance Board ("Access Board") while its membership drafted the 2010 ADA Standards for Accessible Design ("2010 Standards"), and who chaired the Access Board when the DOJ adopted the 2010 Standards, regarding the 300 level seats. (DX 158.) Mr. Anderson took photographs of the view of the field from the accessible seating locations in the Terrace Level and from the adjacent standard seats. (DX 107; DX 108; DX 118; DX 119; DX 127; DX 128.) He opined that the accessible seats on the Terrace Level provide viewpoints that are "equivalent" to adjacent non-accessible general seating and an "equal experience." (Tr. 546:8-19, 548:25.)

Plaintiff's witness, Professor Ferrie, also testified that "most of the seats in [the Terrace] are further back than where [the] pillars are," and "at least half" of the standard, non-accessible seats on the Terrace Level are "obstructed in the same way" as the accessible seats, meaning they also do not have views of pop ups and fly balls because of the upper deck overhang. (Tr. 179:21-180:4, 237:8-16.) Plaintiff testified that sitting in the Terrace Level accessible seats under the overhang is "a decent experience. You just could not see any fly balls." (Tr. 711:7.)

Scoreboards and television monitors are provided throughout the Terrace Level beneath the upper deck to provide the same or similar information provided on the historic scoreboard and the Jumbotrons. (Tr. 321:1-10.) Two field-level LED boards are also provided on the outfield wall: one in front of Section 501 in left field, and one in front of Budweiser Patio in right field. (Joint Stmt. ¶ 19; Tr. 321:8-16.) Like the Jumbotrons, these field level LED boards include

in-game statistics and information such as who is pitching and at bat. (Joint Stmt. ¶ 19; Tr. 324:8-15.)

While most of the accessible seats on the Terrace Level are under the upper deck overhang, the accessible seats on each end of the Terrace Level are not. For example, the four accessible seats in Section 203 and the two accessible seats in Section 231 are not located underneath the upper deck overhang and have a view of the full historic scoreboard. (Tr. 325:15-23; DX 66 at 5; DX 78 at 4.)

2023 season ticket sales for standard seats, totaling 21,000, include thousands of seats on the Terrace Level, including approximately 3,000 behind the support columns for the upper deck and approximately 900 for which the Jumbotrons are not visible. (Tr. 795:21-796:1, 796:12-19.) Of the 50 season tickets sold for accessible seating and associated companion seating for the 2023 season, 28 of them—or 56%—are on the 200 level. (DX 237; Tr. 804:12-17.) All of those season ticket holders have seats behind the columns supporting the upper deck, and all but the four who selected seats in Section 203 have seats under the upper deck overhang. (DX 237.)

There are a number of factors patrons may consider in choosing their seat location when buying tickets. The accessible seats on the Terrace Level positioned beneath the upper deck overhang offer the following features: shaded grandstand seating (Tr. 235:17-22, 297:3-5); weather protection (Tr. 235:14-16, 805:11-13); proximity to an accessible route (Tr. 663:14-20, 667:3-9, 670:15-22, 805:2-6); space to interact with other patrons (Tr. 549:12-19); and lower-cost tickets (Tr. 542:24-543:2).

In July 2017, Plaintiff and Professor Ferrie sat for a game in the 200 level accessible seats on the third base side. (Tr. 167:7-168:11.) Professor Ferrie testified with respect to the view that he could see a line drive hit into the outfield but not anything with more substantial arc to it (Tr.

168:21-25), and he could not see the historic scoreboard or Jumbotrons (Tr. 169:1-7). Professor Ferrie further testified that the accessible seats were, and still are, in front of standing room only patrons separated only by what was left of the aisle. (Tr. 168:4-11.) Standing room only patrons moved forward any time there was serious action on the field, making his experience worse. (Tr. 181:19-182:17.) Professor Ferrie testified that, in his experience as a lifelong baseball fan, standing room only tickets rank as the least desirable for a variety of reasons, including because there is no actual seat, and the ticketholder is physically far from the field. (Tr. 168:12-20.) In his experience, purchasing standing room only tickets is a desperate measure to get inside the park and to hear the crowd, but not necessarily to see the game. (Tr. 177:19-178:6.)

The Cubs sell standing room tickets in periods of very high demand. (Tr. 775:14-21.) A patron with a standing room ticket can choose to stand in approximately twelve different locations throughout the ballpark, including, for example, Gallagher Way, patio areas on the upper deck, the "NUTRL zone" in right field, and the back of the Terrace Level. (Tr. 791:11-792:5.) While the Cubs do not assign standing room ticket holders to any particular location in the ballpark, some choose to congregate in back of the Terrace Level. (Tr. 792:1-8.) Standing room tickets are not necessarily the least expensive option at the ballpark; as with all ticket pricing, it is dynamic for each game depending on how the team has been performing, the sales that have already occurred, the weather, or if there is something special about that game. (Tr. 766:18-22.)

### D. 300 Level

The 300 level of Wrigley Field, which is part of the upper deck, overhangs the grandstand below. (Tr. 300:16-17.) Because of Wrigley Field's small footprint, the location of the 300 level seats are similar to club level seating in other major league ballparks. (Tr. 300:16-

15

24.) There is no dispute in this case regarding the views from the 300 level; Plaintiff testified that the accessible seats there provide "a really good view of the field because you can see all the action on the field and the neighborhood as well." (Tr. 738:17-18.)

The 2010 Standards require that rear entry wheelchair spaces be 36" wide by 48" deep. 2010 Standards §§ 802.1.2, 802.1.3. All of the accessible seats at issue in this case on the 300 level (and throughout the rest of the ballpark) are rear entry. (Tr. 529:10-13.) Mr. Anderson inspected the measurements for each of the 225 accessible seats, concluding that all 225 are compliant with the ADA's minimum wheelchair space dimensions. (Tr. 499:20-23, 500:11-18; DX 230.) Plaintiff, however, introduced measurements of Sections 309L, 313L, and 328R that he contends show those seats are too small or improperly overlap with the cross-aisle behind the seats.[3]

### i.    Sections 309L, 313L, 328R

At issue in this case are the dimensions of the accessible seating areas in sections 309L, 313L, and 328R, which requires consideration of the dimensions of not only the area designated as a wheelchair space, but also the area and intended use of adjacent aisles.

The wheelchair spaces in those sections partially overlap the cross aisle behind them. (Tr. 787:11-22). Before the 2023 season, the Cubs had a policy under which they did not allow patrons to traverse the cross aisles behind those wheelchair spaces (Tr. 836:11-13), but the Cubs

---

[3] Despite the Court's Order on the first morning of trial—which was subsequently reconsidered and upheld during trial—excluding evidence of measurements of any other section on the 300 level, Plaintiff proposes findings of fact respecting other 300 level sections. Because such evidence was excluded, the Court does not consider it herein. (*See* 14:4-7 (limiting Plaintiff to introducing evidence of measurements of Sections 309L, 313L, and 328R); *see also* Tr. 128:10-130:21 (clarifying Plaintiff's inspections of 306L and 323R are inadmissible given the only change in those platforms between his initial inspection and later inspection was the removal of bolts to the front of the concrete platforms).)

desired to have that flexibility in use for the 2023 season and going forward. (Tr. 479:13-16.) Accordingly, in March 2023, the Cubs installed an extension to the front of the accessible seating platforms in those sections. (Tr. 505:20-506:2, 520:21-24.) The Cubs consulted with Mr. Anderson and egress consultant John Mammoser of Jensen Hughes to ensure that the accessible seating areas complied with ADA and egress dimension requirements. (Tr. 479:11-16, 788:1-8, 818:8-820:9.)

Those accessible seating sections also have a railing that extends up and then angles back toward the seating platform. (Tr. 382:2-7, 504:18-23; *see, e.g.*, PX 175.) The bottom of the railing leaves space between the railing and the platform to provide for a wheelchair user or other patron's "toe space." (*See* PX 175.)

Plaintiff introduced evidence, through lay witness testimony, photographs, and a 36" by 48" cardboard template (PX 300), of the purported dimensions of the accessible seating in Sections 309L, 313L, and 328R. On April 9, 2023—the day before trial commenced—Plaintiff, his counsel, Professor Ferrie, and Mr. Eley went to Wrigley Field to inspect and photograph those sections. (Tr. 186:3-9.) Professor Ferrie described the inspection proceeding as follows:

> We moved through each of the accessible seating areas on that aisle of the upper deck. A tape measure was used to measure the distance from the front of the concrete slab in the accessible seating area to the aisle and then to the wall of the aisle behind. That measurement was taken. It was determined how far the front of the railing was in the accessible area using a plumb line, and a measurement was taken by putting a 48inch long piece of cardboard down on the surface of the accessible area so that its front was at the point where the plumb line came down, and then measuring the remaining distance from the edge of the cardboard template to the outside of the wall behind and taking that measurement.

(Tr. 186:10-23.) Photographs were also taken with two individuals trying to pass each other shoulder-to-shoulder in the space remaining from the back of the cardboard template to the wall. (Tr. 186:24-187:1.) Plaintiff's counsel, having no expert witness, determined where to start the

tape measure, where to drop the plumb line and where to place the cardboard template within the accessible seating space. (Tr. 221:15-20, 222:8-23.)

In lieu of setting forth each measurement Plaintiff submitted at trial, the Court summarizes as follows: for Sections 309L, 313L, and 328R, Plaintiff submitted measurements that would purportedly establish that the wheelchair spaces are too short from front to back. As described by Professor Ferrie's testimony, Plaintiff's counsel's methodology had the intended effect of excluding from the measurement any ground space that lay underneath the angled railing. Because Plaintiff introduced no evidence, such as expert opinion, and the law does not support, *infra* Conclusions of Law Section III.A., that the ground space beneath an angled railing must be excluded, the Court finds that Plaintiff introduced no credible evidence of the dimensions of the wheelchair spaces and aisles in Sections 309L, 313L, or 328R. Accordingly, Mr. Anderson's measurements control.

Plaintiff also introduced evidence at trial that sitting upright, Plaintiff's wheelchair just fits within the minimum depth for a wheelchair space required by the ADA. (Tr. 460:18-22.) However, Plaintiff testified that he must periodically lay flat in order to allow for adequate blood circulation and to prevent sores. (Tr. 702:2-10.) If Plaintiff were to purchase a ticket for a wheelchair space that only meets the minimum wheelchair space dimensions, Plaintiff would extend out into the circulation path or aisle behind the wheelchair space while lying flat. (Tr. 461:4-6.) This issue is exacerbated in those wheelchair spaces that have railings that extend at an angle over the clear floor space, because the height of Plaintiff's feet while he is laying flat do not permit him to slide under the angled railing. (Tr. 461:7-13.)

### E. The Bleachers

Except for those areas of the bleachers sold exclusively to groups, all seating in the

bleachers is sold as "general admission" single tickets. (Joint Stmt. ¶ 31.) "General admission" means a ticket holder is able to sit anywhere in the bleachers he or she chooses. (Tr. 203:4-7; Joint Stmt. ¶ 31.) As with general admission tickets in many stadiums, bleacher seats are "first come, first serve;" non-accessible seating is "first come, first serve," and accessible seating is "first come, first serve." (Tr. 373:5-7.) Individuals who purchase accessible general admission accessible bleacher tickets can choose to sit in Section 501, the left or right field porches, or the Batter's Eye. (Tr. 229:12-230:3.)

### i.    Batter's Eye

The Batter's Eye is a baseball term that refers to the area in center field behind the pitcher that is within the batter's line of sight. (Tr. 327:3-10.) There are several unique features of the Batter's Eye accessible seating at issue in this case.

Major League Baseball ("MLB") requires that the visual backdrop in the Batter's Eye provide sufficient contrast and an uncluttered backdrop so the batter, catcher and umpire can better see the pitched white ball, per MLB regulations. (Joint Stmt. ¶ 20; Tr. 327:3-10.) Prior to 2017, the accessible seats in the Batter's Eye were located behind a green mesh windscreen. (Joint Stmt. ¶ 22.) During the 2016-2017 off-season, the mesh was replaced with glass with a tinted film with the intent of improving the view for individuals choosing to sit in accessible seating in the Batter's Eye and improving "congruence with the . . . glass that was below it" in the Bleacher Suite. (Tr. 620:4-14 (Rice).) The Bleacher Suite—a premium seating area sold exclusively to groups that commands a higher price because of its desirability—is located directly below the Batter's Eye accessible seats. (Tr. 327:21-25, 329:3-4, 342:18-21.) The windows on the Bleacher Suite and the Batter's Eye accessible seats have "extremely similar tints" (Tr. 328:4-9 (Meenan)), which is comparable to the tint of sunglasses. (Tr. 406:10-11.)

Professor Ferrie testified that watching the game from the Batter's Eye at night was, in his experience, dark enough that it was challenging to see what was occurring on the actual field. (Tr. 164:5-13.) The Cubs in turn introduced evidence that during night games, Wrigley Field is "very well lit" and that MLB guidelines require that the Cubs provide lighting "dispersed naturally throughout the outfield" and the ballpark. (Tr. 376:4-16 (Meenan).)

As for day games, Plaintiff testified that the glass made it difficult to see the game whether the sky was overcast, because the glass became darker, or sunny, due to a glare on the glass. (Tr. 718:7-14.) Mr. Anderson, on the other hand, inspected the Batter's Eye accessible seats as well as the tinted glass and "didn't think it was a dark tint" or "that it interfered with being able to view the field." (Tr. 551:3-10.) While the Cubs compared the tinted glass in front of the accessible seating area to that in the luxury Bleacher Suite, the floor of the accessible Batter's Eye seating area is the ceiling above the Bleacher Suite (Tr. 329:8-12), leading to the inference that the sun would not enter the space to create a glare on the glass as with accessible seating. During the 2017 season, patrons sitting in the Batter's Eye accessible seats raised concerns about the glare, as well as other patrons cutting through the Batter's Eye accessible seating area. (Tr. 333:12-24, 620:24-621:6.) To address those concerns, the Cubs added a mesh covering along the roof, sides, and rear of the Batter's Eye. (Joint Stmt. ¶ 22; Tr. 331:12-23, 621:7-12.)

Plaintiff testified that because of the dark glass in front and mesh along the roof, sides and rear, the Batter's Eye is "a very dark[,] secluded section of the stadium." (Tr. 718:14.) The Cubs submit, on the other hand, that the Batter's Eye accessible seats are located directly next to standard bleacher seating on either side, in which patrons commonly sit. (Tr. 329:8-16, 332:16-333:7; *see also* DX 27.) There is, however, a television camera separating the Batter's Eye from

the bleacher seats immediately to the right. (Tr. 401:3-8.)

The Cubs further submitted evidence that the accessible seats in the Batter's Eye are "extremely popular." (Tr. 334:19-24 (Meenan).) They provide a "unique space" that offer a variety of features, including: a unique panoramic and unobstructed view of Wrigley Field (Tr. 401:16-19, 634:9-14); shaded outfield seating (Tr. 334:7-10); weather protection (Tr. 333:17-334:3, 552:16-553:12); a less crowded space, which may be preferred by individuals who are immune-compromised, or have sensory issues or a service animal (Tr. 401:20-24); or proximity to restrooms, concessions, and an accessible route (Tr. 231:7-11, 552:22-23).

### ii. Section 501

The three accessible seats in Section 501—one of four accessible seating options one can choose from with an accessible seating bleacher ticket—are located in the left field corner of the bleachers, straight down the foul line. (Tr. 290:9-10; *see* DX 9.) The seating platform in Section 501 is a "very large area" with more than enough space for patrons requiring accessible seating to approach and position themselves in an accessible seat. (Tr. 526:20-527:3.) When viewed from the pitcher's mound, Section 501 accessible seating appears off to the side of the bleachers. There are only accessible seats in that area, which is partially encircled by railings. (Tr. 769:8-770:3; DX 90.) The Senior Director of Ticket Operations for the Cubs, Mr. Patel, testified that any patron holding a bleacher general admission ticket can access the area as well. (Tr. 769:8-25.) As Mr. Patel put it, that area of the ballpark is a "communal space" and "open area for the ballpark" and all patrons can "walk through it." (Tr. 769:22-25, 770:13-14.)

Plaintiff elicited testimony purporting to show that there are no non-accessible seats in front or to the right, left or rear, so there can be no interaction or high fives with patrons who are not in accessible seating. (Tr. 738:23-739:15, 771:3-771:23.) The Cubs, however, introduced

21

evidence showing that there is standard bleacher seating just to the left of and below the Section 501 accessible seats. (Tr. 771:9-12; DX 90; PX 161.) Standard and accessible seats are also located in Section 101 of the grandstand, directly in front of and below Section 501. (DX 9; PX 161.) While the parties' evidence is seemingly contradictory, their disagreement is a matter of degree. There are non-accessible seats to the left of and below the Section 501 accessible seats, but they are not physically close enough to where a patron in a non-accessible seat would be able to engage in a high-five with a patron in an accessible seat.

### iii.    Budweiser Patio

Prior to 2012, Plaintiff particularly enjoyed sitting in the area now known as the Budweiser Patio, located in the right field bleachers. *Supra* Findings of Fact Section I.C. Budweiser Patio has been sold exclusively to groups since at least 2012. (Joint Stmt. ¶ 34; Tr. 340:18-20, 637:14-21.) The Cubs provide a number of group seating areas at Wrigley Field to accommodate the needs of patrons wishing to entertain clients or have group or family outings, among other reasons. (Tr. 340:21-341:12, 341:22-342:23.) The purchase of a group area includes allocation of a set number of tickets; no individual, regardless of ability or disability, can purchase single, individual tickets for those areas. (Joint Stmt. ¶ 31.) Budweiser Patio is accessible to Plaintiff, and he could sit there if part of a group who leased that space. (Joint Stmt. ¶ 34.)

Individually ticketed accessible seating options are available directly adjacent to the Budweiser Patio on both sides: in the right field porch in the bleachers and in Sections 132-134 in the grandstand. (Tr. 344:7-12, 348:1-19; *see also, e.g.*, DX 35 (Section 134); DX 35 (right field porch).) Both Section 134 and the right field porch provide comparable views to those available from Budweiser Patio. (*Compare* DX 193 (view from Section 134) *with* PX 32 (view

22

from Budweiser Patio) *with* PX 89 (view from right field porch).)

### F. Comparison to Accessible Seating Prior to 1060 Project

There are far more accessible seating choices available after the 1060 Project than before. (Tr. 611:20-612:2, 676:13-21.) Prior to the 1060 Project, accessible seating was provided in 15 total areas of Wrigley Field. (Tr. 606:22-609:7; DX 1; DX 10; DX 224.) No accessible seating options were available in the left field bleachers, the right base side of the grandstand at any vertical level, the first or third base sides of the 100 level of the grandstand, the first base side of the 200 level of the grandstand, or the first or third base sides of the 300 level of the grandstand. (Tr. 606:22-609:7; DX 224.)

Today, accessible seating is designated in 42 sections: on the first and third base sides and behind home plate on the 100, 200, and 300 levels of the grandstand and in four locations in the bleachers, including in left field, center field, and right field. (Tr. 351:1-352:11; DX 9; DX 225.) Where there were none before, there are now ten accessible seats designated in the left field bleachers; 64 on the first base side of the grandstand; 47 on the first and third base sides of the 100 level; 23 on the first base side of the 200 level; and 41 on the first and third base sides of the 300 level. (Tr. 351:1-352:11; DX 225.)

### G. Plaintiff's Attendance at Wrigley Field After 2014

Subsequent to 1060 Project renovations, Plaintiff sat in accessible seating somewhere in Sections 117 to 120 behind home plate, which he testified provides the "best view" relative to other accessible seats (Tr. 741:19-742:13), and accessible seating in the 300 level, which provides "a really good view of the field because you can see all the action on the field and the neighborhood as well." (Tr. 738:7-18.)

Plaintiff also sat, along with Professor Ferrie, in accessible seating in the Batter's Eye,

the right field porch, Section 104 or 105 down the third base line, and in the Terrace Level in Sections 206 to 207 or 214 to 215. (Tr. 167:10-168:11, 233:21-234:4, 240:25-241:12.) Plaintiff's and Professor Ferrie's least preferred accessible seating areas are the Terrace Level and the Batter's Eye. Plaintiff testified that the Batter's Eye is "a very dark[,] secluded section of the stadium." (Tr. 718:14.) Professor Ferrie testified that sitting in the Batter's Eye, which is fully enclosed, is very different from being in the open air where one can interact with other patrons or players on the field, catch a souvenir baseball, and hear the game. (Tr. 162:23-163:4, 163:19-23.) Professor Ferrie contrasted that experience with former accessible seating in the bleachers, which were close to general admission patrons and one could hear the game and possibly catch a home run or baseball thrown by a player between innings. (Tr. 162:3-21, 163:9-16, 204:12-16.)

As for the Terrace Level seats, in Professor Ferrie's experience they are the worst in the house and he would not sit there if he had any other option. (Tr. 237:17-21.) In Professor Ferrie's experience attending baseball games at stadiums around the country, one of the most significant architectural features of Wrigley Field is its center field hand-operated scoreboard. (Tr. 155:2-13, 155:8-10, 158:19-22.) Plaintiff prefers to sit in a seat with a view of this scoreboard, as well as the Jumbotrons and high balls, which are often difficult or impossible to see from accessible seats on the Terrace Level. (*See*, *e.g.*, Tr. 746:7-748:19.)

Witnesses for the Cubs, on the other hand, testified that the "best" and "worst" seat in the house is subjective, and any particular patron's seating preferences, regardless of his or her need for an accessible seat, varies depending on his or her preferred view of the field, time of year, budget, the Cubs' opponent during a particular game, weather, with whom the patron is attending, or proximity to an accessible route, restrooms or concessions. (Tr. 310:17-311:5, 686:19-25, 790:6-24.) For example, Mr. Patel testified that for the 2023 season, the Cubs sold at

least one season ticket in every section on the 100 level, 200 level, 300 level, 400 level, and in the bleachers, which is comparable to sales from prior years. (Tr. 794:16-18, 795:3-20, 798:6-24.) Of the season tickets for accessible seating areas, eight are in the 100 level, 28 are in the Terrace Level, ten are in the 300 level, and four are in the bleachers. (DX 237.) Those tickets are in 14 different sections around the field of play, which is consistent with sales for prior years. (Tr. 807:4-7.)

## CONCLUSIONS OF LAW

### I.    Jurisdiction

The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which confers on the federal district courts original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States. The substantive law applicable to this case is the ADA, 42 U.S.C. § 12101, *et seq*.

### II.    Legal Standards

Plaintiff brings this lawsuit under Title III of the ADA, which proscribes discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). To establish his *prima facie* case, Plaintiff bears the burden of showing, "(1) [he] is disabled within the meaning of the ADA; (2) defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) defendant discriminated against [him] by denying [him] the full and equal opportunity to enjoy the services defendant provides." *Thomas*

*v. Kohl's Corp.*, No. 17 C 5857, 2018 WL 704691, at *3 (N.D. Ill. Feb. 5, 2018). [4] The parties do

not dispute that the first and second elements are met—rather, the case centers on whether the

Cubs discriminated against Plaintiff. Plaintiffs' only remaining claims are that the Cubs denied

him the full and equal opportunity to enjoy its services because Wrigley Field does not have the

minimum number of accessible seats required by Sections 221.2.1.1 and 221.2.1.2 of the 2010

Standards and because those seats are not horizontally dispersed around the field of play as

required by Section 221.2.3.1 of the 2010 Standards.

As a threshold matter, the Court first must determine the level of deference owed to the

2010 Standards. Courts must "afford 'considerable weight' to an agency's 'construction of a

statutory scheme it is entrusted to administer[.]'" *Jeffers v. Comm'r of Internal Revenue*, 992

F.3d 649, 654 (7th Cir. 2021) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467

U.S. 837, 844 (1984)). The *Chevron* analysis requires determining whether "the statute is silent

or ambiguous on the question at issue" and if so, whether "the agency has promulgated a

reasonable interpretation of the statute." *Id.* (citing *Brumfield v. City of Chicago*, 735 F.3d 619,

626 (7th Cir. 2013).) Only then is the regulation given deference. *Id.*

The ADA itself sets out only broad principles for the elimination of discrimination

against persons with disabilities, instead granting the DOJ the authority to promulgate

regulations and guidelines for its implementation. 42 U.S.C. § 12186(b); *see also* 28 C.F.R. §

36.101 *et seq.* In promulgating and implementing its regulations, the DOJ is required to "be

consistent with the minimum guidelines and requirements issued by the [Access Board]." 42

U.S.C. § 12186(c); *see also* 29 U.S.C. § 792(a)(1). In 2004, the Access Board produced updated

---

[4] Because controlling case law on the issues Plaintiff raised at trial is sparse, the Court cites to
persuasive authority throughout this Opinion.

guidelines that the DOJ adopted as the 2010 Standards. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1076 (7th Cir. 2013). Further, the 2010 Standards are a reasonable interpretation of the ADA because they are the Access Board's "official position" rather than "ad hoc statement[s;]" they implicate the agency's "substantive expertise" in accessible design standards; and they reflect "fair and considered judgment"—meaning they are not merely a "convenient litigating position" or a "*post hoc* rationalization" to justify past agency action. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416-17 (2019) (cleaned up). For all of these reasons, the Court defers to the requirements set forth in the 2010 Standards.

The parties also rely at various times upon Access Board advisories to, and DOJ analysis, commentary or guidance on, the 2010 Standards. The same analysis set forth above to determine whether deference should be given to an agency's interpretation of a statute also applies to an agency's interpretation of its own regulations. *Kisor*, 139 S. Ct. at 2415; *see also id* at 2414 ("Agency advisories and guidance are only given deference if the regulation is 'genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation.'"). To determine whether a statute or regulation is ambiguous, "a court must 'carefully consider' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id*. at 2415. In this case, the Court addresses the level of deference owed to certain advisories and guidance below in conjunction with the specific issues raised at trial.

Turning to the issues in this case, when an entity makes alterations to a place of public accommodation—such as Wrigley Field—after January 26, 1992, discrimination under the ADA includes the "failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." 42 U.S.C. § 12183(a)(2); 28 C.F.R. §

36.402(a)(1). An alteration is defined as a change that "could affect the usability of the building or facility or any part thereof" and includes "remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions." 28 C.F.R. § 36.402(b). The meaning of "alteration" does not include "[n]ormal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems[.]" *Id*.

Any alterations made on or after March 15, 2012—such as those conducted as part of the 1060 Project—must, to the maximum extent feasible, comply with the 2010 Standards unless it is "virtually impossible" to do so. 28 U.S.C. § 36.402(c). Alterations to facilities that are designated as "historic" are not required to provide physical access in a manner that would "threaten or destroy the historic significance of the building or facility." 28 C.F.R. § 36.405; *see also* 42 U.S.C. § 12204(c). "Historic" includes any locations that are eligible for listing in the National Register of Historic Places under the National Historic Preservation Act, 16 U.S.C. § 470 *et seq*., or are otherwise designated as historic sites under local or state law. 28 C.F.R. § 36.405.

Plaintiff has the initial burden of showing that there has been an alteration and that the altered area is not compliant with the 2010 Standards. *Bailey v. Bd. of Comm'rs of La. Stadium & Exposition Dist.*, 484 F. Supp. 3d 346, 385 (E.D. La. 2020), *aff'd sub nom. Bailey v. France*, 852 F. App'x 852 (5th Cir. 2021). If Plaintiff meets this initial burden, the burden shifts to the Cubs to show that compliance with the 2010 Standards was virtually impossible, *id*., or would threaten or destroy the historic significance of the building or facility.

### III. Plaintiff Has Not Met His Burden of Showing That Wrigley Field Does Not Have the Minimum Required Number of Accessible Seats.

28

Plaintiff first claims that Wrigley Field does not have at least the minimum number of accessible seats required by the ADA. Plaintiff points to certain sections of seats designated as accessible by the Cubs on the 200 level, 300 level, and in the bleachers, and claims that they fail to comply with the ADA either because they provide the worst views in the ballpark, are too small, and/or are isolated from general admission patrons.

There is no dispute between the parties as to the method for calculating the minimum required number of accessible seats. The 2010 Standards require that "assembly areas"—such as ballparks—provide a minimum number of accessible seats based on the facility's total seating capacity. For large assembly areas, the minimum number of accessible seats needed is 36 plus an additional seat for every 200 seats over 5,000. 2010 Standards § 221.2.1.1. The 2010 Standards specify that the minimum number of accessible seats required for "general seating" be calculated separately from seating in areas such as suites, which are sold or leased in their entirety. 2010 Standards §§ 221.2.1.1, 221.2.1.2 and Advisory thereto; *see also Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393, 401-02 (D.D.C. 1996) (holding that suite seating must be excluded from the general seating capacity in determining required number of wheelchair spaces). Following these guidelines, the total general seating capacity of Wrigley Field is 39,510, and the minimum number of accessible seats is 209. *Supra* Findings of Fact Section II, Intro.

Not including accessible seats provided in suite or group seating areas, the Cubs designate as accessible a total of 225 seats. *Supra* Findings of Fact Sections II, Intro., II.B. If each seat complies with the ADA, the Cubs exceed the minimum by 16 seats. For the reasons explained below, Plaintiff fails to show that Wrigley Field does not have at least 209 accessible seats that are compliant with the ADA.

### A. Measurements of Wheelchair Spaces on the 300 Level

Plaintiff claims that 15 accessible seats on the 300 level are not compliant with the ADA because they do not meet the minimum applicable dimensions required by the 2010 Standards for wheelchair spaces. Plaintiff, however, submits no credible evidence, *supra* Findings of Fact Section II.D.i., to support his position. The only credible evidence before the Court are the measurements taken by Cubs' expert Mr. Anderson, which Mr. Anderson concluded comply with the ADA. Even if Plaintiff had introduced credible evidence of any measurements, however, his claim still fails as a matter of law.

Plaintiff takes issue with the angled railings in accessible seating in sections 309L, 313L, and 328R. *Supra* Findings of Fact Section II.D.i. The question at hand boils down to this: can the ground space underneath the angled railings be included when measuring the depth of a wheelchair space for the purposes of ADA compliance? Plaintiff submits they cannot and so the wheelchair spaces are either too short or improperly extend into the circulation path behind them.

As a threshold matter, the Cubs take the position that the standard for unaltered portions of a facility should apply. (DPFFCL ¶¶ 171-72.) With respect to facilities or portions of a facility that have not been altered subsequent to January 26, 1992, Title III of the ADA requires that architectural barriers be removed only where such removal is "readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv). The Court is skeptical that these three sections are best categorized as unaltered, considering the renovations to their accessible seating areas were not complete until the month before trial. *Supra* Findings of Fact Section I.D.vi. In any event, Plaintiff fails to carry the lighter burden of showing that these seats do not comply with the 2010 Standards to the "maximum extent feasible"—*i.e.*, the standard applicable to renovated portions of the facility. 28 C.F.R. § 36.406(a)(3).

The minimum space required for a single wheelchair space entered from the rear is 36" wide by 48" deep. 2010 Standards §§ 802.1.2, 802.1.3. The 2010 standards do not permit wheelchair spaces to overlap with a "circulation path," 2010 Standards § 802.1.5, which is defined as "[a]n exterior or interior way of passage provided for pedestrian travel, including but not limited to, walks, hallways, courtyards, elevators, platform lifts, ramps, stairways, and landings." 2010 Standards § 106.5. As long as a facility complies with the applicable design requirements, it is not required to accommodate "wheelchairs or other power-driven mobility devices that exceed those requirements." 28 C.F.R. pt. 36, app. A.

The 2010 Standards are silent as to any required measurement for a "circulation path." The Advisory to Section 802.1.5, however, clarifies that "[t]he term 'circulation paths' as used in Section 802.1.5 means aisle width required by applicable building or life safety codes for the specific assembly occupancy." This agency interpretation is reasonable—it is the Access Board's "official position" rather than an "ad hoc statement[,]" implicates the agency's "substantive expertise" in accessible design standards, and reflects "fair and considered judgment"—meaning it is not merely a "convenient litigating position" or a "*post hoc* rationalization" to justify past agency action. *Kisor*, 139 S. Ct. at 2416-17.[5] Common sense dictates that egress safety requirements for any given facility depend in part upon considerations of its intended use and occupancy. Accordingly, the Court defers to the Advisory and turns to the "applicable building or life safety codes" for Wrigley Field. *Kisor*, 139 S. Ct. at 2414.

Mr. Anderson opined that the applicable building code requires the cross aisles behind the spaces at issue to have a minimum width of 44 inches. (Tr. 822:7-15); Chicago Building

---

[5] For the sake of efficiency, the Court states but once here that it finds that each of the Advisories to the 2010 Standards referenced in this Opinion are the Access Board's official position.

Code 13-88-170(c)(2) (2018).[6] Plaintiff submitted photographs during trial that purport to show two individuals who could not pass shoulder to shoulder behind the accessible seats on the 300 level. *Supra* Findings of Fact Section II.D.i. But neither the 2010 Standards, the Advisory thereto, or the applicable building code determine cross aisle width based upon on one or two individuals' shoulder width. *See* Advisory to 802.1.5; 2018 Chicago Building Code 13-88-170(c)(2); (Tr. 419:7-10 (Anderson).)

Using the 44-inch minimum width for the cross aisle, the ADA requires at least 92 inches between the front of the accessible seating platforms in Sections 309L, 313L, and 328R and the back of the cross aisle between the 300 and 400 levels. Mr. Anderson opined that the accessible seats in Sections 309L, 313L, and 328R are compliant with the 92-inch minimum requirement. (Tr. 525:3-9, 818:24-819:1, 819:5-8, 820:1-9.) If Plaintiff is correct as a matter of law that the space under the angled railing cannot be included, however, then the Cubs fall short.

Chapter 3 of the 2010 Standards, entitled "Building Blocks," states, "[w]here space beneath an element is included as part of clear floor or ground space or turning space, the space shall comply with 306." 2010 Standards § 306.1. Section 306 of the 2010 Standards in turn sets forth the dimensions for knee and toe clearance beneath an element. Element is broadly defined as "[a]n architectural or mechanical component of a building, facility, space, or site." 2010 Standards § 106.5. Mr. Anderson opined that the angled railing is considered an "element" under Section 306.1, and so knee and toe clearance beneath the element may be included when calculating the dimensions of a wheelchair space. (Tr. 507:10-20.) Plaintiff takes the position that that the railing is not an "element" under the 2010 Standards, seizing upon Mr. Anderson's

---

[6] The 2018 Chicago Building Code applied when Sections 309L, 313L, and 328R were installed. The current Chicago Building Code does not change the 44-inch requirement. (Tr. 820:1-9.)

testimony that the railing has cupholders and claiming that this cannot be enough to make it an "object that people use," like a water fountain. (Tr. 566:7-567:9.)

In short, at issue is whether the angled railing in sections 309L, 313L, and 328R constitutes an "element" under the 2010 Standards. The terms "architectural," "mechanical," and component" are not defined and so "shall be as defined by collegiate dictionaries in the sense that the context implies." 2010 Standards § 106.3. The Oxford English Dictionary defines "component"—somewhat circularly here—as "[a] constituent element or part." *Component*, Oxford English Dictionary, https://www.oed.com/view/Entry/37759 (last visited June 08, 2023). "Constituent" in turn means "[t]hat jointly constitute, compose, or make up." *Constituent*, Oxford English Dictionary, https://www.oed.com/view/Entry/39840 (last visited June 08, 2023). "Architectural" is defined as "[o]f, relating to, or according to, architecture[,]" which in turn is defined in part as "structure [or] building." *See Architectural*, Oxford English Dictionary, https://www.oed.com/view/Entry/10403 (last visited June 08, 2023); *Architecture*, Oxford English Dictionary, https://www.oed.com/view/Entry/10408 (last visited June 08, 2023). Putting these definitions together provides an understanding of "element[s]" as the parts that jointly make up the structure or building as a whole.

The Court observed during its site visit that the railings at issue here are affixed in concrete between the wheelchair spaces and a not-insubstantial vertical drop-off to the row of seats immediately in front of and below the wheelchair platform and would prevent patrons from stepping or falling off the drop-off. They plainly function as a safety guardrail and/or handrail, are part of the structure of the stadium as a whole as "architectural . . . component[s,]" and so are "elements." The text, context, and purpose of the 2010 Standards all point in the same direction. *Cf.* 2010 Standards §§ 505.1 (listing a section on "Handrails" under the chapter entitled "General

33

Site and Building Elements"), 1005.4 (requiring fishing piers with "railings, guards, or handrails" to comply with the clear floor or ground space requirements of Section 305); 42 U.S.C. § 12101 (stating that the purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" including the discriminatory effects of architectural barriers).[7] Contrary to Plaintiff's contention, there is nothing in the language of the 2010 Standards that limits an "element" to an "object that people use" similar to a water fountain.

Further, Chapter 3 of the 2010 Standards states: "*Unless otherwise specified*, clear floor or ground space *shall be permitted* to include knee and toe clearance complying with 306." 2010 Standards § 305.4 (emphasis added). Plaintiff somewhat obscurely takes the position that because "the provisions of Chapter 8 shall apply where required by Chapter 2 or where referenced by a requirement in this document," and because there is no reference to Section 305.4 anywhere in Chapter 8, Section 305.4 does not apply to the accessible seating wheelchair spaces in Wrigley Field. (PPFFCL 66.) Plaintiff's argument appears to have it backwards—the provision Plaintiff cites deals with the applicability of Chapter 8 requirements when referenced elsewhere in the 2010 Standards, not the applicability of Chapter 3 requirements at all. Nothing in Chapter 8, or Chapter 2, expressly prohibits the application of Chapter 3 to wheelchair spaces, and, while not controlling in this instance in light of the unambiguous definition of "element," it

---

[7] Plaintiff's position, if correct, may have the effect of increasing the size, and thus accessibility to Plaintiff, of certain wheelchair spaces on the 300 level. But at bottom, Plaintiff argues for a narrow definition of "element" that would exclude railings from the requirements set forth in the 2010 Standards, which were determined by the Access Board as the standards for accessible design in furtherance of the ADA's goal of eliminating, among other things, the discriminatory effects of architectural barriers. While it is impractical for the Court to attempt to predict all circumstances in which railings may be used, the Court is loath to effectively carve those areas out of the accessibility standards dictated by the 2010 Standards absent legislative or agency intent to do so.

is worth noting that the Advisory on the scope of Chapter 8 contemplates the concurrent application of other chapters. *See* Advisory to 2010 Standards § 801.1 ("Facilities covered by these requirements are also subject to the requirements of the other chapters."). For all of these reasons, the Court finds that the ground space underneath the railings at issue in Sections 309L, 313L, and 328R may be included in the depth dimension of those wheelchair spaces.

The Court next turns to the specific knee and toe clearance required by the 2010 Standards. For toe clearance, "[s]pace under an element between the finish floor or ground and 9 inches (230 mm) above the finish floor or ground shall be considered toe clearance and shall comply with 306.2." 2010 Standards § 306.2.1. With respect to the minimum required depth, "[w]here toe clearance is required at an element as part of a clear floor space, the toe clearance shall extend 17 inches (430 mm) minimum under the element." 2010 Standards § 306.2.3. The 2010 Standards allow for a maximum of 6 inches of space for toe clearance "beyond the available knee clearance at 9 inches … above the finish floor or ground." 2010 Standards § 306.2.4.

For knee clearance, "[s]pace under an element between 9 inches (230 mm) and 27 inches (685 mm) above the finish floor or ground shall be considered knee clearance and shall comply with 306.3." 2010 Standards § 306.3.1. With respect to the minimum required depth, "[w]here knee clearance is required under an element as part of a clear floor space, the knee clearance shall be 11 inches (280 mm) deep minimum at 9 inches (230 mm) above the finish floor or ground, and 8 inches (205 mm) deep minimum at 27 inches (685 mm) above the finish floor or ground." 2010 Standards § 306.3.3. Mr. Anderson submitted unrebutted evidence at trial that all of the accessible seating on the 300 level complies with the toe and knee space requirements of the 2010 Standards. (Tr. 517:12-22.)

It is most unfortunate that the type of wheelchair Plaintiff uses, and the manner in which he uses it, does not fit in some of the accessible seats on the 300 level. *Supra* Findings of Fact Section II.D.i. The Court expresses sympathy for the difficulty these circumstances pose to Plaintiff. Nonetheless, these circumstances in and of themselves do not constitute a violation of the ADA. As Mr. Anderson explained, "in developing standards [the Board] realized that the standards weren't going to meet 100 percent of the needs 100 percent of the times for 100 percent of the people. It's difficult to do that, but what you're trying to do is get options to provide the greatest opportunities for the largest number of people. So it's not set up as an individual-preference basis. It's set up to try to provide access for the whole group of people that would make up the disabled population." (Tr. 535:24-536:7.)

For all of these reasons, Plaintiff fails to show that Sections 309L, 313L, and 328R do not comply with the dimensions required for wheelchair spaces under the 2010 Standards.

## B. Seating Locations, Viewing Angles and/or Integration in the 200 Level, Section 501, and Batter's Eye

At issue in this case are the 2010 Standards' requirements respecting the views from accessible seats, as well as their integration with non-accessible seating areas in the 200 level, Section 501, and/or the Batter's Eye. The Court addresses each area in turn.

### i. 200 Level (Terrace Level) Accessible Seats

Plaintiff claims that the majority of the 76 accessible seats at the Terrace Level violate the requirement in the 2010 Standards that "[w]heelchair spaces . . . provide spectators with choices of seating locations and viewing angles that are substantially equivalent to, or better than, the choices of seating locations and viewing angles available to all other spectators." 2010 Standards § 221.2.3.

Plaintiff relies heavily upon the Advisory to Section 221.2.3, which provides the following guidance: "Consistent with the overall intent of the ADA, individuals who use wheelchairs must be provided equal access so that their experience is substantially equivalent to that of other members of the audience. Thus, while individuals who use wheelchairs need not be provided with the best seats in the house, neither may they be relegated to the worst." DOJ analysis and commentary on the 2010 Standards similarly advises that "wheelchair locations do not have to be exclusively among the seats with the very best lines of sight nor may they be exclusively among the seats with the worst lines of sight[; r]ather, wheelchair seating locations should offer a choice of viewing experiences and be located among the seats where most of the audience chooses to sit." 28 C.F.R. pt. 36, app. B.

Plaintiff introduced evidence that all of the 200 level accessible seats are in the very last row of the Terrace Level, and that most are under the upper deck overhang and so have some of the most severely obstructed views of the aerial game and historic center field scoreboard of all the seats at Wrigley Field. *Supra* Findings of Fact Section II.C. Plaintiff claims that those seats are therefore among the "worst" in the ballpark and on the Terrace Level in violation of the Advisory to Section 221.2.3 and the DOJ's analysis and commentary.

The Cubs, on the other hand, submitted evidence supporting that those seats are compliant with Section 221.2.3 because they "provide spectators [in need of accessible seats] with *choices* of seating locations and viewing angles that are substantially equivalent to . . . the *choices* of seating locations available to all other spectators." 2010 Standards § 221.2.3 (emphasis added). For the reasons explained below, the Court agrees.

As a preliminary matter, the agency advisory, analysis and commentary relied upon by Plaintiff are agency interpretations of Section 221.2.3 and are only given deference if they are

reasonable interpretations and if Section 221.2.3 is "genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation." *Kisor*, 139 S. Ct. at 2414. The 2010 Standards do not define the phrase "viewing angles," and it is used only a handful of times elsewhere in the 2010 Standards. For example, regulations require that stadium-style movie theaters locate wheelchair spaces "within the area of an auditorium in which the vertical viewing angles (*as measured to the top of the screen*) are from the 40th to the 100th percentile of vertical viewing angles for all seats as ranked from the seats in the first row (1st percentile) to seats in the back row (100th percentile)." 28 C.F.R. 35.151(g)(4) (emphasis added). Measuring the viewing angle from a wheelchair seat up to the top of the movie screen fits with the dictionary definition of "angle" as "[t]he indefinite space between two lines or surfaces that meet, at or close to their meeting point." *Angle*, Oxford English Dictionary, https://www.oed.com/view/Entry/7542 (last visited June 08, 2023).

But such a mathematical measurement is neither expressly contemplated in Section 221.2.3 nor necessarily fits in the context of a baseball stadium. The meaning of "viewing angles" may differ when used in the context of a movie theater, where a patron sits facing a screen that may be extremely close in proximity and well above eye-level, requiring craning his or her neck uncomfortably upwards, versus a baseball stadium, where the audience encircle a field of play that may be far below them and can view the action from a variety of perspectives and with possible structural obstructions in their line of sight. Accordingly, the Court finds that the meaning of "viewing angles" in Section 221.2.3 is ambiguous.

Next, the Court must consider whether the Advisory to Section 221.2.3 and DOJ analysis and commentary, 28 C.F.R. pt. 36, app. B, fall "within the bounds of reasonable interpretation" of the 2010 Standards. *Kisor*, 139 S. Ct. at 2416 (internal quotation marks and citation omitted).

Weighing in favor of reasonableness, both provisions implicate the agencies' "substantive expertise" in accessible design standards and reflect "fair and considered judgment"—meaning neither is merely a "convenient litigating position" or a "*post hoc* rationalization" to justify past agency action. *Id*. at 2416-17 (cleaned up).[8] They further the goals of the ADA to address the discriminatory effects of architectural barriers and assuring equality of opportunity and full participation for people with disabilities. 42 U.S.C. § 12101(a)(1), (5), (7). Accordingly, the Court gives deference to the Advisory to Section 221.2.3 and to the quoted DOJ analysis and commentary located at 28 C.F.R. pt. 36, app. B.

The Court turns next to whether Plaintiff has carried his burden of showing the Cubs fails to "provide spectators [that require accessible seating] with choices of seating locations and viewing angles that are substantially equivalent to, or better than, the choices of seating locations and viewing angles available to all other spectators[,]" 2010 Standards § 221.2.3, as interpreted to require that their "experience is substantially equivalent to that of other members of the audience[,]" Advisory to 2010 Standards § 221.2.3, and that wheelchair spaces not be "relegated to the worst [seats in the house,]" *id*., nor "exclusively among the seats with the worst lines of sight[.]" 28 C.F.R. pt. 36, app. B.

Most importantly, the evidence submitted at trial showed that patrons requiring accessible seats have a wide variety of seating locations, views of the field, and experiences to choose from throughout Wrigley Field. Mr. Anderson opined that the DOJ uses a proportionality test as a guide in assessing whether accessible seating is adequately represented in a particular area of a stadium. (Tr. 539:24-540:5); *see also* 28 C.F.R. pt. 36, app. B ("[W]heelchair seating locations

---

[8] The Court also finds that the DOJ analysis and commentary, along with each DOJ analysis, commentary and guideline referenced in this Opinion, constitute the agency's official position.

should . . . be located among the seats where most of the audience chooses to sit."). The Cubs submitted unrebutted evidence, in the form of Mr. Anderson's testimony, that the Terrace Level accessible seats satisfy the proportionality test because the number of accessible seats is proportional with the number of standard seats on that level. (Tr. 540:13-541:5.) Specifically, the accessible seats on the Terrace Level represent 34% of the 225 total accessible seats, while 36% of the overall seating at Wrigley Field is on the Terrace Level. *Supra* Findings of Fact Section II.C.[9] Even if more than half of the accessible seats on the Terrace Level were among the "worst" seats at Wrigley Field, wheelchair spaces throughout Wrigley Field are not "*relegated to* the worst [seats in the house,]" Advisory to 2010 Standards § 221.2.3 (emphasis added), nor "*exclusively* among the seats with the worst lines of sight[.]" 28 C.F.R. pt. 36, app. B (emphasis added).

Plaintiff nonetheless fails to show that the accessible seats on the Terrace Level are the "worst [seats in the house]" or the "seats with the worst lines of sight" at Wrigley Field. In support of his claim, Plaintiff submitted photographic and testimonial evidence that the view of the aerial game from most of the accessible seats on the Terrace Level is obstructed by the overhanging grandstand. *Supra* Findings of Fact Section II.C. A similar issue was raised in *Bailey* respecting a concrete overhang that obstructed the view of aerial plays, including long passes or punts, at the Superdome in New Orleans. *Bailey*, 484 F. Supp. 3d at 394. The sight line requirements at issue were from a prior version of the Access Board design standards that similarly required "a choice of . . . lines of sight comparable to those for members of the general

---

[9] Even if the Court were to exclude the 15 accessible seats in the Batter's Eye from the calculation, *infra* Conclusions of Law Section III.B.iii, the 76 accessible seats on the Terrace Level would represent 36% of the 210 remaining accessible seats and therefore would still be proportional with the number of standard seats on the Terrace Level.

public." *Id*. at 391-92 (citing ADA Standards for Accessible Design § 4.33.3 (1991) ("1991 Standards") (now located at 28 C.F.R. pt. 36 app. D)); *see also* 28 C.F.R. pt. 36 app. B (noting the "viewing angles" language in Section 221.2.3 is "consistent with the [DOJ's] longstanding interpretation of [Section 4.33.3 of] the 1991 Standards"). The court found that "the accessible seating in Row 36 has the same obstruction, the concrete overhang, to aerial play as the next several rows o[f] nonaccessible seating in the 100 Level" and so "the sightlines from accessible seats to aerial play are comparable to the sightlines from nonaccessible seats" and so complied with the applicable design standards. *Id*. at 395-96. Similarly here, the next several rows of nonaccessible seating on the Terrace Level have the same obstruction as the accessible seats to viewing aerial play. *Supra* Findings of Fact Section II.C.

Plaintiff next introduced evidence purporting to show that accessible seats on the Terrace Level are the "worst in the house" because they are directly in front of standing room only ticketholders. Plaintiff relies upon Professor Ferrie's lay opinion that standing room only patrons do not come to watch the game and that the tickets are the least desirable. *Supra* Findings of Fact Section II.C. But the opinion of one lay person, which is necessarily based only upon his perception of the standing room only patrons that he has observed firsthand and his own preferred experience at a baseball game, *see* Fed. R. Evid. 701, is of limited weight. On the other hand, the Cubs introduced evidence that standing room tickets are not necessarily the least expensive in the ballpark, that ticket pricing is dynamic for each game depending on certain variables, and that standing room ticket patrons can choose to stand in about a dozen different locations throughout the ballpark. *Supra* Findings of Fact Section II.C. Accordingly, the fact that standing room only patrons sometimes stand behind the accessible seats on the Terrace Level does not merit a finding that those accessible seats are the worst in the house.

Professor Ferrie also testified that standing room only ticketholders pushed forward towards accessible seats during exciting moments of the game he attended in 2017, worsening his experience. *Id*. But Plaintiff makes the reverse complaint, claiming that cordoning off the Batter's Eye and Section 501 from the concourse behind them has the effect of isolating patrons in accessible seats. That is not to say that Plaintiff's and Professor Ferrie's experiences are invalid; rather, their testimonies represent the varied preferences of individual patrons as well as the difficult balance between adequate views of the playing field, integration with other patrons, and proximity to accessible routes and facilities. *See, e.g.*, 28 C.F.R. § 36.406(f)(1) (requiring that accessible seats be "dispersed to all levels that include seating served by an accessible route").[10]

Plaintiff next complains that the historic scoreboard, and in some instances the Jumbotrons, cannot be seen from many accessible seats on the 200 level. *Supra* Findings of Fact Section II.C. The court in *Bailey* considered a similar complaint and found that accessible seating underneath an overhang was compliant with the ADA where patrons sitting in nonaccessible seats in the last eight rows were also unable to view the Jumbotron and where "[s]imilar or identical information to that displayed on the Jumbotron is also provided on auxiliary monitors located throughout the Superdome, albeit on smaller screens." *Bailey*, 484 F. Supp. 2d at 394; *see also* 2010 Standards § 103 (permitting use of designs products or technologies as alternatives to those prescribed, provided they result in substantially equivalent accessibility or usability). Here, scoreboards and television monitors are provided underneath the upper deck to display

---

[10] Based on 28 C.F.R. § 36.406(f)(1), the Cubs are in fact required to locate accessible seats at the rear of the Terrace Level, which is served by an accessible route, and the failure to do so would have been noncompliant with the ADA.

substantially equivalent information to that provided on the historical and electronic scoreboards in the outfield. *Supra* Findings of Fact Section II.C.

Witnesses for the Cubs testified that the "best" and "worst" seat in the house is subjective, and any particular patron's seating preferences, regardless of his or her need for an accessible seat, varies depending on his or her preferred view of the field, time of year, budget, the Cubs' opponent during a particular game, weather, with whom the patron is attending, or proximity to an accessible route, restrooms or concessions. *Id*. For example, Mr. Patel testified that for the 2023 season, the Cubs sold at least one season ticket in every section on the 100 level, 200 level, 300 level, 400 level, and in the bleachers, which is comparable to sales from prior years. *Id*. Of the season tickets for accessible seating areas, eight are in the 100 level, 28 are in the Terrace Level, ten are in the 300 level, and four are in the bleachers. *Id*. Those tickets are in 14 different sections around the field of play, which is consistent with sales for prior years. *Id*.

The Cubs further introduced unrebutted evidence that season ticket sales for non-accessible seats include thousands of seats on the Terrace Level, including approximately 3,000 behind the support columns for the upper deck and approximately 900 for which the videoboards in left and right field are not visible. *Id*. Of the season tickets sold for accessible seating, 56% are on the 200 level, all of those chose seats in accessible seating areas behind the columns supporting the upper deck, and all but the four chose seats under the upper deck overhang. *Id*. While not a dispositive fact, evidence of patrons' purchasing choices sheds light on their preferred seating locations, viewing angles, and experiences. *Cf.* 28 C.F.R. pt. 36, app. B. (in evaluating whether one viewing angle is better than another, the DOJ comments that "designers and venue operators understand which seats are better and that understanding routinely drives design choices made to maximize profit and successful operation of the facility, among other

things."). The evidence revealed a number of factors patrons might prefer when choosing to purchase accessible seats on the Terrace Level, including shaded grandstand seating, weather protection, proximity to an accessible route, space to interact with other patrons, and lower-cost tickets. *Supra* Findings of Fact Section II.C. Expert Mr. Anderson opined that Terrace Level accessible seating complies with the ADA for this, among other, reasons. *Id*.

Finally, Plaintiff alludes to an argument that the Terrace Level accessible seating violates Section 202.3.1 of the 2010 Standards, which states: "An alteration that decreases or has the effect of decreasing the accessibility of a building or facility below the requirements for new construction at the time of the alteration is prohibited." (PPFFCL 54.) Plaintiff does not develop any argument or evidence regarding what the standard is for "new construction at the time of the alteration," let alone whether and how it differs from the standard applicable to the alterations at issue in this case. *See* 28 C.F.R. § 36.406(a)(3) ("New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 2010 Standards . . ."). Accordingly, this argument does not merit a different result.

For all of these reasons, Plaintiff fails to show that the accessible seats on the Terrace Level do not comply with the 2010 Standards.

### ii.    Section 501

Plaintiff complains that the three accessible seats in Section 501 violate the integration requirement of Section 221.2.2 of the 2010 Standards for several reasons. First, they are the only seats in that area and are separated from non-accessible seats by railings. *Supra* Findings of Fact Section II.E.ii. Second, there are no non-accessible seats to the right or rear. *Id*. The non-accessible seats to the left and in front are physically far enough away that a patron would not be able to engage in a high five with patrons sitting in the accessible seats. *Id*. Third, when viewed

from the pitcher's mound, Section 501 accessible seating appears off to the side of the bleachers. *Id*.

Section 221.2.2 requires that wheelchair spaces be "an integral part of the seating plan." 2010 Standards § 221.2.2. The term "integral" is not defined, although Oxford English Dictionary defines it as "[o]f or pertaining to a whole[.]" *Integral*, Oxford English Dictionary, https://www.oed.com/view/Entry/97344 (last visited June 09, 2023). Elsewhere in the 2010 Standards, the term is used in dissimilar contexts, *see, e.g.*, Section 505.6, which does not otherwise shed light on how to determine whether an accessible seating area is part of the whole seating plan.

At least one district court found that the similar phrase "integral part of any fixed seating plan" in Section 4.33.3 of the 1991 Standards means that "accessible seating is not entirely placed in one location." *Bailey*, 484 F. Supp. 3d at 400. At that time, however, the integration requirement was grouped together in the same sentence as the lines of sight requirement. *See* 1991 Standards § 4.33.3 (now located at 28 C.F.R. pt. 36 app. D). While *Bailey* provides context for the scope of the meaning of "integral" in the 2010 Standards, the lines of sight and integration requirements therein each stand alone, and there is little in the language that would support a finding that wheelchair spaces are "an integral part of the seating plan" solely for the fact of not being placed entirely in one location in the stadium. Accordingly, the Court finds that Section 221.2.2 is ambiguous.

The Advisory to Section 221.2.2 provides the following guidance:

> The requirement that wheelchair spaces be an 'integral part of the seating plan' means that wheelchair spaces must be placed within the footprint of the seating area. Wheelchair spaces cannot be segregated from seating areas. For example, it would be unacceptable to place only the wheelchair spaces . . . outside the seating area defined by risers in an assembly area.

Based on the Advisory, it is conceivable that accessible seating locations could be located in many places around a stadium, but still be "segregated" from non-accessible seating in violation of Section 221.2.2 if they were—to take an extreme hypothetical—enclosed within solid walls. The integration requirement of Section 221.2.2 and the Advisory thereto thus implicates both dispersal throughout the stadium and preventing the isolation of people with disabilities.

Having considered the Advisory to Section 221.2.2, the Court finds that it falls "within the bounds of reasonable interpretation" of the 2010 Standards because it implicates the Access Board's substantive expertise on accessible design and reflects "fair and considered judgment" in furtherance of the ADA's stated goal addressing the isolation and segregation of people with disabilities. *Id*. at 2416-17; *see also* 42 U.S.C. § 12101(a)(2). Accordingly, the Court gives deference to the Advisory to Section 221.2.2.

Next, the Court considers whether the wheelchair spaces in Section 501 are within the footprint of the seating area and are not segregated from non-accessible seating. Although Section 501 accessible seating appears off to the side of the bleachers when viewed from the pitcher's mound, standard and accessible seats are located just to the left of and below the accessible seats in Section 501. *Supra* Findings of Fact Section II.E.ii. And although there are only accessible seats in that area and it is partially encircled by low railings, any patron holding a bleacher general admission ticket can access the area as well. *Id*. That area is a communal space that all patrons can walk through. *Id*. Further, patrons with an accessible seating bleacher ticket do not have to sit in Section 501—they may choose from four locations in the bleachers on a first-come-first-served basis and may change locations during the game if there are other open wheelchair spaces in the bleachers. *Id*.

Further, Section 501 is at the same level as the "seating area defined by risers" in the left field bleachers. (DX 90); *see also Risers*, Oxford English Dictionary, https://www.oed.com/view/Entry/166293 (last visited June 09, 2023) (defining "risers" in part as "[t]he upright part of a step; the vertical piece connecting two treads in a stair"). Although Section 501 is just far enough above the non-accessible seats directly in front to prevent patrons in accessible and non-accessible seats from engaging in high-fives, this metric alone does not indicate segregation. The Court is also cognizant of the difficult balance that must be achieved between integration with non-accessible seats and adequate sight lines from a seated position over the heads of patrons in non-accessible seats who may be standing. *See, e.g.*, 2010 Standards § 802.2.2 ("Where spectators are expected to stand during events, spectators in wheelchair spaces shall be afforded lines of sight complying with 802.2.2."); *Paralyzed Veterans of Am.*, 950 F. Supp. at 398 (recognizing that even in a newly constructed facility "perfect integration is incompatible with enhanced sightlines").

For all of these reasons, Plaintiff fails to show that the accessible seats in Section 501 do not meet the integration requirements of Section 221.2.2.

### iii. Batter's Eye

Plaintiff claims that the 15 accessible seats in the Batter's Eye are segregated from and not integrated with other seating areas in violation of Section 221.2.2 of the 2010 Standards because they are separated from other patrons on three sides with a chain link fence covered by mesh, by a camera to the right, by tinted glass in front, and by a mesh roof overhead. *Supra* Findings of Fact Section II.E.i. Plaintiff further claims the enclosed nature of the Batter's Eye prevents fully hearing the game, players, or other patrons or catching a baseball souvenir, and that the tinted glass makes the view inferior to that enjoyed by general admission patrons

because it is like watching the game through sunglasses even when it is cloudy or dark outside, and when it is sunny, there is a glare on the glass. *Id*. Plaintiff claims that these circumstances also violate the requirement that "[w]heelchair spaces . . . provide spectators with choices of seating locations and viewing angles that are substantially equivalent to, or better than, the choices of seating locations and viewing angles available to all other spectators." 2010 Standards § 221.2.3.

The Court declines to decide whether the 15 accessible seats in the Batter's Eye are ADA compliant, because there otherwise are at least 210 accessible seats at Wrigley Field—one more than the required minimum. *See* 2010 Standards § 221.2.3 ("When the number of wheelchair spaces required by 221.2.1 has been met, further dispersion shall not be required.").

### IV. Plaintiff Has Not Met His Burden of Showing that the Seats Are Not Horizontally Dispersed Around the Field of Play.

Plaintiff next claims that the accessible seats are not adequately horizontally dispersed around the field of play as required under Section 221.2.3.1 of the 2010 Standards, which require that accessible seating "be dispersed horizontally." 2010 Standards § 221.2.3.1.

Horizontal dispersion is neither defined nor otherwise used in the 2010 Standards, although DOJ regulations state that where an "assembly area . . . ha[s] seating encircling, in whole or in part, a field of play or performance, wheelchair spaces and companion seats [must be] dispersed around that field of play or performance area." 28 C.F.R. § 36.406 § (f)(2). The plain meaning of "dispersed" is "[s]cattered or spread about . . . diffused." *Dispersed*, Oxford English Dictionary, https://www.oed.com/view/Entry/55007 (last visited June 09, 2023). There is no further guidance in the regulations or 2010 Standards as to how to analyze whether accessible seats are adequately dispersed around the field of play. One court found, when interpreting Section 4.33.3 of the 1991 Standards that "[d]ispersal requires a choice of various seating areas,

good and bad, expensive and inexpensive, which generally matches those of ambulatory spectators" and "there must be spaces scattered throughout a sufficiently representative number of sections in the seating bowl to provide comparable choices." *Paralyzed Veterans of America,* 950 F. Supp. at 404. The Court finds that the meaning of horizontal dispersion in the 2010 Standards is genuinely ambiguous. *Kisor*, 139 S. Ct. at 2414.

The Advisory to Section 221.2.3.1 provides a less-than-enlightening definition: "Horizontal dispersion of wheelchair spaces is the placement of spaces in an assembly facility seating area from side-to-side or, in the case of an arena or stadium, around the field of play or performance area." The Cubs' expert Mr. Anderson testified that the Access Board in their training instructs that one should impose a plus sign on top of a map or drawing of the arena or stadium and determine whether accessible seating is provided in each of the four quartiles of the arena or stadium. (Tr. 531:16-23.) Mr. Anderson further testified that accessible seating at Wrigley Field is sufficiently horizontally dispersed because they are not only dispersed around the field of play in each of the four quartiles of the stadium, but also to multiple locations within each quartile. (Tr. 534:9-17.) It is doubtful that Mr. Anderson's expert testimony regarding Access Board training, however, constitutes the "official position" of the Access Board. *See, e.g.*, *Kisor*, 139 S. Ct. at 2416 (listing cases and noting that the speech of a mid-level official and an informal memorandum do not constitute the "official position" of an agency); *see also id*. (finding an "official position" must "at the least emanate from" actors and vehicles "understood to make authoritative policy in the relevant context").

Nonetheless, even setting aside the seats located in the Batter's Eye, *supra* Conclusions of Law Section III.B.iii., accessible seating is available in 41 sections at Wrigley Field: on the first and third base sides and behind home plate on the 100, 200, and 300 levels of the grandstand

and in three locations in the bleachers, including in left field and right field. *Supra* Findings of Fact Section II.F. Having found that Plaintiff fails to show that certain accessible seats on the Terrace Level, 300 level, and in Section 501 violate the ADA, it is hard to imagine a greater spread of accessible seats around the field of play. Accordingly, the Court finds that Plaintiff fails to carry his burden of showing that the accessible seats at Wrigley Field are not horizontally dispersed in violation of the ADA.

### V.    Relief

Plaintiff fails to prove each element of his ADA case by a preponderance of the evidence. The Court consequently finds in favor of the Cubs and does not reach the issue of relief.

### CONCLUSION

Although Plaintiff's situation is unfortunate, he fails to prove that the Defendant violated the ADA. Specifically, Plaintiff fails to prove by a preponderance of the evidence that Defendant fails to have the required number of accessible seats and that the accessible seats are horizontally dispersed around the stadium. Consequently, the Court enters judgment in favor of Defendant.

**SO ORDERED.**                                    **ENTERED: June 21, 2023**

**HON. JORGE ALONSO**
**United States District Judge**